IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**MARTHA CUSTER, et al.,**

**Plaintiff,**

v.

**CERRO FLOW PRODUCTS, INC.,** a
Delaware corporation with its principal
place of business located in Illinois, et al.,

**Defendant.**                                               **No.09-514-DRH**

## MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

### I. Introduction

This matter comes before the Court on Plaintiffs' Motion to Remand (Doc. 25). Defendants Pharmacia Corporation ("Pharmacia"), Solutia Inc. ("Solutia"), Monsanto AG Products, LLC ("Monsanto AG"), and Pfizer Inc. (collectively referred to as "the Pharmacia Defendants") filed a response (Doc. 32). Plaintiffs have filed a reply (Doc. 38). Plaintiffs have also filed a motion to strike supplement to notice of removal (Doc. 34). Defendants have filed a response to that motion (Doc. 40). Defendants have also filed a motion for oral argument (Doc. 33) to which Plaintiffs have responded (Doc. 36). However, the Court finds that the parties have fully briefed their positions and that an oral argument on this matter is unnecessary. Therefore, the Court **DENIES** the motion for oral argument (Doc. 33). For the following reasons, the Court **GRANTS** Plaintiffs' motion to remand (Doc. 25).

## II. Background

Plaintiffs' complaint focuses on the release of hazardous substances at three sites. The first site is an approximately ninety (90) acre landfill operated by Sauget & Co. (the "Sauget Landfill"). The second site is an approximately three-hundred fourteen acre site known as the W.G. Krummrich Plant located in Sauget and operated by one or more of the Defendants, and the third site is property abutting the Monsanto Facility and owned by Defendant Cerro Flow Products, Inc. (Doc. 2, Ex. A ¶2). Plaintiffs allege that beginning in 1935, Defendants have released into the environment various hazardous substances, including polychlorinated biphenyls ("PCBs"), dioxins, furans, and other substances other than Agent Orange[1], into the environment which Plaintiffs allege has created a serious health risk to those residents living within the contaminated areas (*Id.* at ¶¶ 3-5). All the Plaintiffs are Illinois citizens who have either suffered serious life-threatening illnesses, including cancer, which was allegedly caused by their exposure to the hazardous substances, or have suffered property damage as a result of the exposure to the substances.

Plaintiffs allege that one or more Monsanto Defendants, over the course of the relevant years, have stored or disposed PCBs at either the Monsanto Facility or the Sauget Landfill (*Id.* at ¶ 23). Specifically, Defendant Cerro was engaged in copper recycling operations and through the course of their operations, scrapped PCB transformers, drained manfacturing wastewater and PCB oil into Dead Creek

---

[1] Plaintiffs have specifically excluded Agent Orange from the allegations in their Complaint and state that the action does not include Agent Orange. (Doc. 2, Ex. A at ¶ 1).

Segment A, or landfilled substances on the Cerro Facility which allegedly caused the release of substances into the affected area.  Further, the Monsanto Defendants released substances through various methods.  First, Plaintiffs allege that substances were released from fugitive emissions from manufacturing and packaging processes (***Id***. at ¶ 26).  Substances were also released through spillage, the use, cleaning, and storage of leaking PCB transformers, as well as incomplete incineration of PCBs at the Monsanto Facility (***Id.***).  Plaintiffs also allege that substances were released through improper burning of waster, discharge into surface waters, discharge into wastewater systems, and improper disposal of waste into landfills (***Id.***).

On July 9, 2009, Defendants Pharmacia Corporation ("Old Monsanto"), Solutia Inc., and Monsanto AG Products filed a notice of removal arguing that removal was proper based on **28 U.S.C. § 1442(a)(1)**, commonly known as **Federal Officer Removal**.  Beginning in 1935 and continuing through 1977, Old Monsanto manufactured PCBs at the W.G. Krummrich Plaint in the Village of Sauget, Illinois.  In 1940, the Chemical Warfare Service (CWS), a part of the War Department (now the Defense Department) contracted with Old Monsanto to build a chemical plant on land immediately north of Old Monsanto's W.G. Krummrich Plant to manufacture certain chemicals for the war effort (***Id***. at ¶¶ 16-17).  Specifically, Old Monsanto produced CC-2, otherwise known as Impregnate II.  Over the next three years, Old Monsanto built two more plants for CWS, one to produce CC-2 and another to produce dichloramine-T, otherwise referred to as DAT.  The CWS directly controlled

the plant, but contracted with Old Monsanto to operate the three plants (*Id*. at ¶ 18, 27). CWS also contracted with Old Monsanto to dump the waste materials generated from the plants into dumpsters and then haul those dumpsters to the Sauget dump in the Village of Sauget (*Id*. at ¶¶ 27-28).

During the Vietnam War, the Department of Defense contracted with Old Monsanto to manufacture Agent Orange, a herbicide used to strip foliage in Vietnam (*Id*. at ¶ 19). Between 1965 and 1969, Old Monsanto manufactured Agent Orange according to specifications from the Department of Defense. While Old Monsanto manufactured part of the chemical, 2,4,5-T at a plant in West Virginia, the other half of the chemical mixture, 2,4-D, was manufactured at the W.G. Krummrich Plant. The two chemicals were also combined at the W.G. Krummrich Plant according to Department of Defense specifications and then prevailing environmental standards (*Id*. at ¶¶ 19-20, 32).

In 1970, Old Monsanto ceased production of PCBs for all uses except for uses in electrical transformers and capacitors. The federal government as well as electrical industry representatives urged Old Monsanto to continue its production of PCBs, as ceasing production completely could "cripple the nation's power grid" (*Id*. at ¶ 21). Also, in 1972, five federal agencies issued a joint report finding that PCBs were necessary in capacitors and transformers (*Id*. at ¶ 22). Old Monsanto continued to make PCB until 1977 at the urging of the federal government and in accordance with then-prevailing environmental standards (*Id*. at ¶33).

### III.  Analysis

A defendant may remove a case only if a federal district court would have original jurisdiction over the action.  *See* **28 U.S.C. § 1441**; ***Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)**.  Statutes providing for removal are construed narrowly, and doubts about removal are resolved in favor of remand.  ***Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993)**.  The burden of establishing jurisdiction in the federal courts falls on the party seeking removal.  *Id.*  In its notice of removal, the Defendants assert that this case is removable pursuant to **28 U.S.C. § 1442(a)(1)**, because a removing defendant is being sued for actions taken at the direction of a federal official.  Defendants have also filed a supplement to their notice asserting an entirely new basis for jurisdiction, specifically, diversity of citizenship pursuant to **28 U.S.C. § 1332**, **as amended by the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.)**.

**A.     Motion to Strike Supplement to Notice of Removal**

Plaintiffs have filed a motion to strike Defendants' supplement to notice of removal, arguing that it is untimely (Doc. 34).  Defendants have filed a response arguing that their supplement is timely.  "A notice of removal may be amended more than thirty days after the time to remove [set out in **28 U.S.C. § 1446(b)]** has expired 'only to set out more specifically the grounds for removal that already have been stated, albeit imperfectly, in the original notice….  Completely new grounds for

removal jurisdiction may not be added and missing allegations may not be furnished, however." *Alsup v. 2-Day Blinds, Inc.*, 435 F. Supp.2d 838, 844 n.2 (S.D. Ill. 2006) (quoting 14C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Joan E. Steinman, Federal Practice & Procedure § 3733 (3d ed. 1998 & Supp. 2005)) (collecting cases).  *See also Bova v. U.S. Bank, N.A.*, 446 F. Supp.2d 926, 937 (S.D.Ill. 2006); *Brown v. Alter Barge Line, Inc.*, 461 F. Supp. 2d 781, 785 (S.D. Ill. 2005).  Here, Defendants supplement sets out entirely new grounds for removal and is thus untimely.  Further, the Complaint does not meet the requirements of **28 U.S.C. §1332(d)(11)(B)(i)** as there are only twenty-one Plaintiffs in this action.  Therefore, Plaintiffs' motion to strike (Doc. 34) is **GRANTED**. Defendants supplement to notice of removal (Doc. 30) is **STRICKEN**.

**B.     Federal Officer Removal**

Defendants argue that removal is proper pursuant to 28 U.S.C. § 1442(a)(1).  **28 U.S.C. § 1442(a)(1)** allows for the removal of "[a] civil action...commenced in a State court against...[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such offense[.]" Section 1442 permits the removal of the entire case even when only one of the controversies in the case involve a federal officer or agency.  *See Alsup v. 3-Day Blinds, Inc.*, 435 F. Supp. 2d 383, 844 (S.D. Ill. 2006) (citing *State of N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs.,*

*Inc.*, **719 F.Supp. 325, 334 (D.N.J. 1989)); 14C Wright, Miller, Cooper & Steinman,** *Federal Practice & Procedure* **§ 3727. Section 1442** is an exception to the general rule that removal is based on federal questions raised in plaintiff's well-pleaded complaint and allows for removal on the defensive side of the equation rather than based on the plaintiff's complaint, allowing removal regardless of whether the complaint raises a federal question. *Jefferson County, Ala. v. Acker*, **527 U.S. 423, 430-31, 119 S.Ct. 2069, 2074-75 (1999) ("Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law.").** The purpose of the statue is to ensure a federal forum where federal officials "must raise defenses arising out of their official duties." *Wisconsin v. Schaffer*, **565 F.2d 961, 964 (7th Cir. 1977)**.

In order to seek removal under the statue, the Defendant must meet a three-part test: (1) that it is a "person" within the meaning of the Act; (2) that the defendant has a colorable defense to state-law liability; and (3) that it acted under the direction of a federal officer, meaning that there is a casual nexus or connection between the plaintiffs' claims and the defendant's actions performed at the direction of a federal officer. *Jefferson County, Ala.*, **527 U.S. at 431, 119 S.Ct. at 2075**. The party seeking removal has the burden of proving all of the elements of the test, and failure to do so requires remand. *Alsup*, **435 F. Supp.2d at 845**.

### 1. *"Person" within Meaning of the Statute*

The vast majority of cases hold that a corporation is a "person" within the meaning of **28 U.S.C. § 1442(a)(1)**. *See Alsup*, **435 F.Supp.2d at 845 n.3 (agreeing with the weight of authority that a corporation is a "person" within the meaning of the statute (collecting cases))**. Further, the Plaintiffs do not dispute that Defendants are a "person" for purposes of section 1442. Thus, the Court finds that the only issues before the Court are in regards to the second and third elements of the test.

### 2. *Colorable Federal Defenses*

The Defendants must next establish that they have a colorable federal defense to their actions. Defendants argue in their response to the motion to remand that they have two possible defenses: the government contractor defense and the Toxic Control Substances Act.

#### a. **Government Contractor Defense**

The government contractor defense is a defense used in products liability actions. *See Boyle v. United Technologies Corp.*, **487 U.S. 500 (1988)**. It is available when "a 'significant conflict' exists between an identifiable 'federal policy or interest and the operations of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* **at 507.** It is available when the duties imposed by the Government contract are contrary to state-imposed duty of care; put another way, the defense is available when complying with the

contracted specifications by the government prevent the defendants from complying with state law. ***Id.* at 509.** "If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest." ***Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989)**.

Plaintiffs here allege that Defendants stored and disposed of PCBs in a improper manner which released hazardous substances into the affected area through spills, leaks, and improper disposal. Defendants argue that the government contracts required them to dispose of wastes in a fashion required by the government. However, Defendants have not pointed to any government requirement that prevented them from handling and disposing of the PCBs with care. While they argue that the CWS contracts required them to dispose of materials in a certain fashion, they have pointed to no such requirement or mandated specifications as to disposal. Therefore, the Defendants do not present a colorable government contractor defense.

### b.     Defense Production Act

Defendants' notice of removal also states that they have a colorable defense under the Defense Production Act.[2] Defendants state only that the

---

[2] The Court notes that Defendants do not support their reliance on the Defense Production Act as a colorable defense in their response to Plaintiffs' motion to remand (See Doc. 32). Defendants response focuses on the Toxic Substances Control Act and the government contractor defense. They have provided no support or any further evidence to show that they are entitled to raise the Defense Production Act as a defense.

production and sale of Agent Orange was done pursuant to an order of the Department of Defense (Doc. 2 at ¶ 35).  The Defense Production Act provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act." **50 U.S.C. § 2157.**  Here, Defendants have pointed to no "rule, regulation, or order issued pursuant" to **50 U.S.C. § 2157**.  While they do say that they developed Agent Orange pursuant to an order they fail to specify or identify what order they were acted under.  Further, Defendants state that the order related to the production of Agent Orange, a chemical mixture specifically excluded from the Complaint by Plaintiffs.  Therefore, Defendants have not demonstrated a colorable defense under the Defense Production Act.

### c. Toxic Control Substances Act

The Defendants also contend that this action is preempted by the Toxic Substances Control Act.  The Toxic Substances Control Act provides that once the EPA has

> prescribe[d] a rule or order...which is applicable to a chemical substance or mixture, and which is designed to protect against a risk of injury to health or the environment associated with such substance or mixture, no State or political subdivision of a State may...establish or continue in effect, any requirement which is applicable to such substance or mixture, or an article containing such substance or mixture, and which is designed to protect against such risk unless such requirement (i) is identical to the requirement prescribed by the Administrator, (ii) is adopted under the authority of the Clean Air Act [42 U.S.C.A. § 7401 et seq.] or any other Federal law, or (iii) prohibits the use of such substance or mixture in such State or political subdivision (other than its use in the manufacture or processing of

other substances or mixtures).
**15 U.S.C. § 2617.**

The word "requirement" does include obligations in the form of common law rules. ***Cippollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992).** The EPA has enacted such regulations regarding PCBs, including the manufacturing, processing, distribution in commerce, storage, and disposal of PCBs. **40 C.F.R. §§ 761 *et seq*.** Defendants argue that their compliance with the EPA's regulations could provide them with a defense to Plaintiff's claims based on the Toxic Substance Control Act. As a showing that they have complied with such regulations may constitute a defense, the Court finds that Defendants have provided a colorable federal defense. However, the analysis does not stop there. The mere availability of a defense does not provide jurisdiction to this Court. ***Arkansas v. Kansas & T. Coal Co.*, 183 U.S. 185, 188 (1901)**. Nor does the fact that the Defendants may raise the Toxic Substance Control Act as a defense allow for removal in this case. Instead, Defendants must meet the third and final element of the federal officer removal statute, **28 U.S.C. § 1442**, in order to establish jurisdiction in this Court.

### 3.    *Acts Performed at Government's Direction*

Finally, in order to remove a case to federal court under the Federal Officer Removal statute, a Defendant must show that it acted under the direction of a federal officer. Section 1442 allows for removal only where the Defendant, "in carrying out the 'act[s]' that are the subject of the petitioner's complaint, was 'acting under' any 'agency' or 'officer' of 'the United States.'" ***Watson v. Philip Morris***

*Companies, Inc.*, **551 U.S. 142, 147, 127 S. Ct. 2301, 2304 (2007)**. "Precedent and statutory purposes make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out,* the duties or tasks of the federal superior." ***Id.* at 152, 127 S.Ct. at 2307 (citing *Davis v. Southern Carolina*, 107 U.S. 597, 600, 2 S.Ct. 636 (1883))**. However, "acting under" requires more than simply complying with laws or regulatory orders. ***Id.* at 153, 127 S.Ct. at 2308 ("A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.")**.

A defendant must do more than show that the acts occurred "under the general auspices of a federal office or officer" as that does not entitle a defendant to removal under Section 1442. Instead, a defendant "must 'by direct averment exclude the possibility that [a state-court action against the defendant] was based on acts or conduct of his not justified by his federal duty.'" ***Alsup*, 435 F.Supp.2d at 847 (quoting Mesa v. California, 489 U.S. 121, 132, 109 S.Ct. 959, 966 (1989)).** Basically, a defendant must establish that the government required them to take certain action or, in other words, the defendant must show that "the government made me do it." ***Id.* at 847-48 (citations omitted).**

In Defendants' Notice of Removal (Doc. 2) they argue that they were acting under the direction of a federal officer in three circumstances, during its

World War II operations at buildings built for the Chemical Warfare Service (CWS) at locations just north of the W.G. Krummrich Plant (*Id*. at ¶¶ 17-18), during its Vietnam War production of Agent Orange (¶ 19), and its PCB Production which occurred in the 1970s (¶¶ 21-23). However, in Defendants' response, they focus solely on the production of chemicals at the CWS plants during WWII.

      **a.**     **Agent Orange**

The Defendants notice of removal argues that it operated under a federal officer when it made Agent Orange during the Vietnam war because the chemical was made in accordance with the specifications given to it by the Department of Defense and with then prevailing environmental standards. However, while some courts have found Federal Officer Jurisdiction warranted in products liability cases for exposure to Agent Orange, here Plaintiffs' claims arise from the storage and disposal of products. **Compare *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (finding that the federal government had strict control over the production of Agent Orange) with *Arness v. Boeing North American, Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998) (removal not maintained where the Government gave specifications as how to use the hazardous materials but gave no direction as to the disposal and storage of the chemicals, the alleged source of Plaintiffs' injuries)**. Defendants have offered no evidence showing that the federal government directed Defendants in any of the actions which Plaintiffs alleged caused them harm. The federal government did not direct the Defendants to store leaking PCB

transformers, spill, incompletely incinerate, improperly burn, discharge into various water ways, or improperly dispose of Agent Orange. More importantly, Plaintiffs' complaint specifically excludes Agent Orange from the sources of the alleged injuries to Plaintiffs. The storage and disposal of Agent Orange is not the basis for the liability claimed by Plaintiffs. Therefore, Defendants can not use the storage or disposal of Agent Orange as the basis for removal.

### b.  PCBs

Defendants have also not offered any evidence suggesting that the federal government directed Defendants on how to dispose of PCBs produced by the Defendants during the 1970s. Instead, Defendants only state in their notice of removal that Old Monsanto manufactured PCBs at the government's urging and according to the environmental standards of the time. They also point to a joint report of five agencies finding that the continued production of PCBs was necessary for electrical services in the United States. However, none of the evidence submitted by Defendants shows the federal government ordered the Defendants to continue production of PCBs or that the government directed the Defendants in how to handle or dispose of the PCBs that they produced. Once gain, the production of PCBs is not at issue in this case, it is the mishandling of PCBs which is the basis of Plaintiffs' complaint. Therefore, the Defendants have not demonstrated that the government directed Defendants in the handling of PCBs nor have they demonstrated that the production of PCBs forms the basis of the liability alleged in this action.

### c.     CWS Plant Operations

Defendants have offered evidence which they claim demonstrates that the federal government directed them in the disposal of chemicals during World War II at the CWS plants, located North of the W.G. Krummrich Plant.  In fact, its this production and disposal of materials at the CWS plants that Defendants allege forms the basis for removal, as argued in their response to Plaintiffs' motion to remand.  In their response to Plaintiffs' motion to remand, Defendants argue that CWS had direct control over the disposal of waste at the CWS plant.

Defendants assert that the evidence submitted demonstrates that CWS directed Defendants in disposing of hazardous substances that were produced at the CWS plant by placing them in dumpsters and hauling the contents to the Sauget dump in the Village of Sauget, Illinois. Defendants offer the deposition testimony of Mr. Charles McDonnell, from an unrelated case, who worked at CWS plant for approximately 18 months in 1943.  Mr. McDonnell testified that an Army colonel who supervised the plant was "in charge of the whole shebang" and that they did anything that "Uncle [Sam]" told them to do (Doc. 32, Ex. B at pp.1 2, 60).  They further point to the deposition testimony of Mr. Ernest W. Mares, who worked as the superintendent in charge of operations at the CWS plant for approximately three and half years during World War II.  Mr. Mares testified that the government was in control of the operations at the CWS plant and that they "oversaw it every day" (Doc.

32, Ex. C at pp. 20, 28).[3]  Mr. Mares also testified that it was his understanding that CWS was in control of disposal of waste from the site (*Id*. at p.133).

In addition to the deposition testimony, Defendants have also offered several exhibits in the forms of letters and correspondence between military officials regarding certain operations at CWS.  The Defendants point to one particular correspondence between a W.C. Kabrich, Brigadier General, and Clarence E. Trotter[4], Lt. Colonel and Chief Liaison officer (Doc. 32, Ex. A, Attachment 2, DCG 002363).  In the correspondence, the commanding officer in charge of the "St. Louis plant" advises the Brigadier General that a substance called S-222 is accumulating in barrels and he asks for the General's concurrence in sewering the S-222 as barrels for storing are in short supply and there is no method for recovering usable chemical components from the S-222 (*Id.*).  The General "recommends" that the S-222 be put in the remaining barrels and that the remainder be sewered, but does not concur in procuring more barrels to store S-222 as it has no usable components (*Id.*).

Defendants submit that the deposition testimony along with the

---

[3] While Defendants state that Mr. Mares testified that the Government was in control of the operation, the Court notes that directly after stating that the Government oversaw the operations at the CWS plant, Mr. Mares also testified that Monsanto was in charge of the basic operations of the plant and that the military had oversight of the plant.

[4] The Court notes that the correspondence sent by Lt. Col. Trotter was between two officers not even listed in Defendants' notice of removal.  Defendants' notice of removal lists four officers that allegedly had "direct and detailed control" of the operations of the CWS plant.  Neither Trotter or Kabrich are listed in the notice.  Defendants' notice of removal does not even alleged that either of these men had control over the CWS plant or that Defendants committed any of the acts alleged in their Complaint at the direction of these officers.  The Court fails to see how this obscure correspondence between two unknown officers about a substance not even alleged in the Complaint demonstrates that Defendants committed the alleged actions at the direction of the federal government.

correspondence are evidence that the Defendants disposed of the materials in the manner in which they did at the government's direction.  However, as Plaintiff's accurately point out, the chemicals produced during World War II occurred at plants built for CWS and located North of the W.G. Krummrich Plant.  Activity at these other plants are not part of the Plaintiff's action as Plaintiff's Complaint focuses on actions taken by Defendants at the W.G. Krummrich Plant involving PCBs, dioxin, and furans.  Defendants contend that the actions are part of the Complaint because, as Mr. Mares's and Mr. McDonnell's testimony demonstrates, the Defendants dumped chemicals at the Sauget landfill, one of the release sites at issue in the Complaint.  However, Defendants have presented no evidence to establish that they were directed by the military to dispose of hazardous substances at the W.G. Krummrich Plant in the manner in which they did.  Further, they have pointed to no evidence that the government directed them to dispose of the substances at the Sauget landfill.  At most, Defendants' evidence shows that the federal government gave them recommendations on how to dispose of S-222 at the CWS plant, a far cry from demonstrating that the government "made them do it."  The evidence merely shows that "the relevant acts occurred under the general auspices of" the government. Further, correspondence from W.G. Krummrich shows that even at the CWS plants, Defendants acted under the "general auspices of" the government as Defendants themselves developed the processes for the chemical products as well as "designed, supervised the erection of, and operated plants for…other secret Chemical Warfare Service Products" (***Id.*** at Ex. A, Attachment 4, DCG 000352 - 000357).

Therefore, Defendants have failed to establish a casual connection between Plaintiff's claims and the acts performed at the federal officer's direction. As Defendants have failed to prove the final element of the federal officer removal, Defendants have failed to demonstrate that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1442.

### IV.  Conclusion

In conclusion, because this Court does not have jurisdiction over this action pursuant to **28 U.S.C. § 1442**, the Court **GRANTS** Plaintiffs' motion to remand (Doc. 25) and **REMANDS** this action to the **Circuit Court of the Twentieth Judicial Circuit in St. Clair County, Illinois.** The Court further **GRANTS** Plaintiff's Motion to Strike (Doc. 34) and **STRIKES** Defendants' Supplement to Notice of Removal (Doc. 30). Further, the Court **DENIES** Defendants' Motion for Hearing (Doc. 33).

**IT IS SO ORDERED.**

Signed this 15th day of December, 2009.

/s/    David R Herndon
**Chief Judge**
**United States District Court**